Forest Lawn Memorial Park Association, Inc. v. Commissioner.
Forest Lawn Mem. Park Ass'n, Inc. v. Commissioner
Docket No. 2006.
United States Tax Court
1946 Tax Ct. Memo LEXIS 99; 5 T.C.M. (CCH) 738; T.C.M. (RIA) 46207; August 20, 1946
*99 Petitioner, a non-profit cemetery corporation, operated a memorial park cemetery in California. Its operations during the taxable years resulted in profits from activities necessarily incident to its charter provisions. It engaged in no other business activity. No part of its net earnings inured to the benefit of any private shareholder or individual. Held, petitioner is an exempt corporation within the meaning of section 101 (5) of the Revenue Act of 1938 and section 101 (5) of the Internal Revenue Code. Melvin D. Wilson, Esq., for the petitioner. E. C. Crouter, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: The Commissioner determined income tax deficiencies for each of the calendar years 1938, 1939, 1940 and 1941, and an excess profits tax deficiency for 1941. Petitioner claims overpayments of income taxes for each of the years 1938, 1939 and 1940. Petitioner also claimed an overpayment of its excess profits tax for 1940, but this proceeding in so far as it related to petitioner's excess profits tax for 1940 was dismissed for lack of jurisdiction by order of this Court entered August 5, 1943. The deficiencies and the claimed overpayments *100 involved for the several taxable years are as follows: Deficiencies
Overpayments
Income
Excess Prof-
Year
Tax
its Tax
Income Tax
1938
$ 639.02
$ 2,968.36
1939
808.62
16,752.15
1940
979.94
24,897.70
1941
39,325.74
$30,713.19
The issues are (1) whether petitioner is exempt from income tax under sections 101 (5) of the Revenue Act of 1938 and the Internal Revenue Code, and exempt from excess profits tax under section 727 (a), I.R.C.; and (2) whether the issue of exemption from tax is res judicata under our decision in Forest Lawn Memorial Park Association, Inc., 45 B.T.A. 1091. A third allegation of error relating to relief under section 722, I.R.C., was abandoned. Findings of Fact Petitioner was organized under the laws of the State of California on February 2, 1926, as a non-profit cemetery corporation. It has its office at 1712 South Glendale Avenue, Glendale, California. It filed its income tax returns for 1938, 1939, 1940, and 1941 with the collector of internal revenue at Los Angeles, California. The following findings in Forest Lawn Memorial Park Association, Inc., supra, involving the taxable years 1933, 1934, 1935 and 1937, are pertinent to the questions to be decided: In 1906 the Forest Lawn *101 Cemetery Association (hereinafter referred to as the cemetery association) was organized under the laws of the State of California to establish and maintain a cemetery in a location now included in the city limits of Glendale, California. Its articles of incorporation provided that it should acquire lands, not exceeding 320 acres in extent, to be held and occupied exclusively as a cemetery for the burial of the human dead; that it should subdivide such lands into lots and plats and sell the lots to purchasers; and that it should apply any surplus arising from the sale of said lots and all other sources for the payment of the land and expenses of the corporation and for the improvement, embellishment, and preservation of the cemetery. The articles also provided that seven trustees, elected by the members of the association, should have the management of the affairs of the corporation, and that it should have no capital stock. During the early years of its operation the cemetery association was not successful. In 1912 it was a small country cemetery of approximately 58 acres, eight miles from Los Angeles, and its sales during that year amounted to only $28,000. It was then purchasing *102 its land from the Tropical Land & Improvement Co., paying therefor 50 percent of the selling price of the lots. In 1912, the cemetery association engaged the services of Hubert Eaton, the present general manager of petitioner, in the capacity of sales agent for "before-need" sales of cemetery lots. Prior to his employment most of the sales of lots had been made at the time of death - "at need." Eaton received a commission of 50 percent of the "before-need" sales for the first year and 40 percent thereafter, out of which he paid all of the selling expenses. Some increase in business resulted from "before-need" sales; but the income of the cemetery association for several years after Eaton's employment was not sufficient to permit it to liquidate its indebtedness to the land company and to a bank. Its operations finally came to a standstill when the land company refused to deed any more land until it should be compensated for land previously sold to the cemetery association. In order to remedy this situation a new land company, the American Security & Fidelity Co., was organized in 1916. It acquired all of the assets of the Tropical Land & Improvement Co., paid the indebtedness of the *103 cemetery association to the bank, and canceled the debt which the association owed to the land company. In 1917 and 1923 the new land company acquired additional lands and dedicated the major portion of such lands to cemetery purposes. Sometime prior to 1919 Eaton instituted the "Memorial Park" plan of cemetery development. The essence of this plan is to make the cemetery a place of beauty, attractive to the living, in addition to providing a safe depositary for the dead. To carry this plan into effect the Forest Lawn Memorial Park Association (predecessor of petitioner) was organized in 1919 as a nonprofit cemetery company. Every person who bought 200 square feet of ground in the cemetery became a member of the association. The activities formerly carried on by the cemetery association were divided. It continued in existence, received title to the land from the land company, executed deeds for interment rights to buyers of lots, retained the residuary title to the property, and handled the perpetual care fund. The Forest Lawn Memorial Park Association received from the cemetery association the income derived from the perpetual care fund, used it in the care of the cemetery property, *104 and conducted the other activities formerly carried on by the cemetery association. The above changes did not completely solve the problems of the cemetery. The Forest Lawn Memorial Park Association had so many members scattered throughout the world or buried in the cemetery that it was impossible to get a majority of them to attend a meeting or to give their consent to various corporate acts. In order to eliminate this difficulty, petitioner, Forest Lawn Memorial Park Association, Inc., was incorporated in 1926, under the laws of the State of California, the word "Inc." being added to the name of its predecessor to distinguish the two corporate entitles. The number of members of petitioner was limited to 30. The purpose of this limitation was to enable the organizers to induce permanent local residents, who were property owners in the cemetery and willing to devote some of their time to the management of the park, to become members in order that it would be possible to get a quorum for the purpose of passing upon various corporate acts. The Forest Lawn Memorial Park Association transferred its assets, without consideration to petitioner. It was never dissolved, inasmuch as it was *105 impossible to reach a majority of its members for a vote upon dissolution. Petitioner's articles of incorporation provide that it shall have no capital stock and shall be operated without profit to any of its members; that the purposes for which it is formed are to own, operate, manage and conduct Memorial Parks in Los Angeles County, California (the term, Memorial Park, being defined to include cemeteries, mausoleums, columbariums, crematories, and any and all methods, manners and kinds and places of burials and interments of the human dead); to do all things necessary for, incident to, or convenient in, modern burials and processes of interring the human dead; to acquire, own, sell, and deal in lands for memorial parks; to acquire, operate, and manage, crematories, mausoleums, columbariums and vaults; to provide for the perpetual care of any and all memorial park property; and: (e) To engage in, conduct and deal generally with and in any and everything pertaining to or necessary or convenient for the preparation of bodies for burial, including the owning, operation and management of one or more mortuaries, and to do any and all things incidental, necessary or desirable thereto, including *106 all forms of preservation, burial or cremation of bodies of deceased persons. * * *
(h) To buy, manufacture, or otherwise acquire, to own, operate, deal in, use and manage, and to sell or otherwise convey, incinerary urns, burial boxes, burial vaults of steel, concrete and/or other material, grave markers, niche memorials, crypt memorials, foundations for markers, monuments, ornamental vases, books, booklets, post cards, flower vases, flowers, plants, trees, shrubs, and nursery and green house products of any and all kinds, including contracts for planting, improving and otherwise decorating grounds, buildings and/or other property, and particularly with and respecting those objects of art, including statuary and other objects useful, necessary or desirable for the artistic development, beautification, embellishment or improvement of any lands and/or buildings, whether located within or without any memorial park, and to own, lease, or otherwise acquire and hold, all necessary lands, plants, buildings and other property necessary therefor. Petitioner's bylaws contain the following provision: NET PROFITS: After the income and disbursements have been made in the manner herein described *107 and there shall remain a net profit, such net profit may at the discretion of the Board of Directors be held and added to the surplus of this association. In the event the Board of Directors deems it advisable that the profits be expended, such profits must be expended in the improvement of the property or for the benefit of this Association and cannot be disbursed to any individual or corporation. The bylaws also provide that all persons who own property of a value of not less than $100 in Forest Lawn Memorial Park, who pay a membership fee of $10 and such annual dues as the board of directors prescribe, and who are duly elected to membership, shall be considered members. Termination of membership does not, in any case, entitle the member to participate in the assets of the corporation. During the years 1933 to 1937, inclusive, petitioner had approximately 25 members, although about 900 lot owners owned sufficient property in Forest Lawn Memorial Park to qualify them for membership. No membership fees or dues have ever been paid by the members, and they receive no dividends, profit, or compensation other than the benefits that flow from the ownership of burial property, the same *108 as all lot owners enjoy. During the taxable years no part of the net earnings of petitioner inured to the benefit of any private shareholder or individual. The statutes of California in effect at the time of the organization of petitioner (Sec. 611, California Civil Code) authorized cemetery corporations either to issue bonds in connection with the acquisition of lands to be used for cemetery purposes and retire them out of the proceeds of sales, or to agree with the persons from whom such lands should be purchased, to pay as the purchase price thereof, any specified share or portion, not exceeding one-half, of the proceeds of the sales, payment to be made at such intervals as agreed upon. The cemetery association had adopted the latter method. It had contracted to pay the land company one-half of the gross proceeds from all sales of lots, plats, and graves (exclusive of sums collected for perpetual care) and 60 percent of the gross proceeds of all sales of niches, crypts, vaults, family sections, private mausoleums, and other mausoleum columbarium property (exclusive of sums collected for perpetual or special care). The cemetery association, with the consent of the land company, assigned *109 all of its rights under the contract to petitioner except the right to manage and control the perpetual care fund, the right to receive the title to the land from the land company, and the right to retain the residuary fee in the lots after the interment rights had been deeded to the individual purchasers. Petitioner was to receive the income from the perpetual care fund in consideration for caring for the lands and other property of the cemetery and all moneys received by it from sales and other operations, except the portion which was to be paid over to the land company, were to be its exclusive property. All land acquired from the land company is thoroughly improved and embellished, oftentimes with statuary. The land company, from 1926 to 1928, was the American Security & Fidelity Co. From 1928 to 1931, it was the Forest Lawn Properties Association, and from 1931 on, it has been the Forest Lawn Co. [hereinafter referred to as the land company]. The American Security & Fidelity Corporation (hereinafter referred to as the holding company) owned all of the stock of the * * * [land company] * * * at all times here material. The buildings erected in Forest Lawn Memorial Park have been *110 built by the land company and petitioner pays rental either to the land company or to the holding company for the use of such buildings and the land on which they are erected. The rentals are fixed by the boards of directors of the corporations, and have been approximately 10 percent of the cost of the property rented, the lessors paying the taxes. The rental paid was fair and reasonable. Petitioner made all contracts for the sale of its services and commodities with the ultimate buyers. In the agreement signed by a purchaser of commodities and services, petitioner agrees to execute and deliver, or cause to be executed and delivered, to the purchaser a good and sufficient certificate of ownership or deed conveying the interment rights in the cemetery property, and a certificate setting forth the amount to be deposited in the perpetual care fund in connection with the purchase of the property. The deeds and certificates of perpetual care were in each instance executed by the cemetery association. The sale of lots by petitioner was, to some extent, dependent upon business referred to it by funeral directors. It refused to pay them any commissions. In August 1932, petitioner ascertained *111 that 82 funeral directors, in and around Los Angeles, had purchased "anywhere from a few to 700 graves apiece" in a competing cemetery. About the same time, an open letter, signed by many of the funeral directors in Los Angeles County, was publicized, recommending the purchase of cemetery property in the competing cemetery. Petitioner concluded that the funeral directors had entered the cemetery business and were exerting their efforts toward diverting business from Forest Lawn to cemeteries in which they were financially interested or which would pay them commissions. These conditions caused petitioner to give consideration to the operation by it of a mortuary. On October 20, 1932, the board of directors of petitioner adopted a resolution authorizing it to engage in the contemplated new activity. A license was applied for and received, and in November 1933 petitioner began the operation of a mortuary on the cemetery grounds. A building for that purpose was erected by the land company and leased to the petitioner. It has been operated almost exclusively for interment in petitioner's cemetery. Occasionally, after a mortuary case has been received by petitioner, the relatives of the *112 deceased decide to ship the body out of the state, or out of the city, and the burial will not be in Forest Lawn. The percentage of such cases is small. During the taxable years petitioner's gross sales, excluding perpetual care collections, consisted of the following items and amounts: Property:
1938
1939
1940
1941
Land
$ 482,112.56
$ 479,599.56
$ 514,395.34
$ 558,863.12
Mausoleum
481,710.65
416,405.19
451,452.75
549,967.25
Total
$ 963,823.21
$ 896,004.75
$ 965,848.09
$1,108,830.37
Statuary and outdoor sarcophagi
1,978.50
3,245.00
835.00
2,690.00
Memorial Tablets and Vases
135,341.48
144,785.30
150,101.82
189,492.08
Interment and Recording charges
55,095.25
70,104.50
75,730.25
88,083.31
Grave Boxes and Vaults
43,984.10
46,206.25
53,056.20
60,500.80
Cremations
36,035.00
37,857.50
41,077.50
41,295.00
Urns for Cremated Remains
6,452.50
11,377.50
8,755.00
12,123.00
Vaultage
904.43
1,021.00
1,028.25
1,078.75
Engraving on Urns and Vases
820.60
904.25
963.12
1,138.55
Flowers
53,457.81
57,810.92
67,328.38
80,278.27
Wedding Services
9,495.00
9,888.50
10,810.00
12,144.00
Organist and Soloist Fees
4,421.50
4,772.75
5,095.00
5,681.25
Booklets
5,790.59
6,068.66
8,316.99
8,513.62
Postcards and Pictures
1,695.85
1,498.29
1,475.07
1,771.58
Miscellaneous
4,617.59
5,196.80
5,646.21
5,992.90
Funeral Services
409,986.66
463,541.34
541,509.14
610,389.31
Grand Total
$1,733,900.07
$1,760,283.31
$1,937,576.02
$2,230,002.79
*113 During the taxable years petitioner was the operating company for Forest Lawn. It was governed by a board of five directors elected by the members. Three of its directors, its president and its vice-president were continued in office throughout the taxable years. The directors appointed Hubert Eaton as general manager, a position he had held at Forest Lawn since prior to 1919. Eaton was responsible to the directors for the operation of petitioner's 21 departments and the management of its 390 to 450 employees. Petitioner had 10 to 14 other officials during the taxable years who devoted their entire time to petitioner's affairs. Eaton originated the idea of memorial parks as cemeteries and has been the leading figure in the development and operation of Forest Lawn. The memorial park idea has been adopted by cemeteries all over theunited States and Eaton is recognized as the outstanding cemetery operator in this country. During 1940, 1,600,000 people visited Forest Lawn to view its art treasures and buildings. Eaton's contract with the petitioner provided that he would receive as compensation for his services 2 1/2 percent upon petitioner's gross sales up to $1,000,000, 3 percent upon *114 petitioner's gross sales in excess of $1,000,000, plus certain services of its employees and supplies. For the taxable years Eaton received approximately the following amounts as total compensation for his services: $55,000 in 1938; $58,000 in 1939; $59,000 in 1940, and $83,000 in 1941. Eaton devoted most of his time to petitioner's affairs and a small amount of time to the affairs of the cemetery association, the land and the holding companies. His services to petitioner were reasonably worth the compensation paid therefor. During the taxable years the land company had about five regular employees, chiefly the officers and directors. It had five directors. Hubert Eaton was a director and the president and general manager of the corporation. He drew a salary of $3,600 a year except for 1941 when he received $3,800. His second cousin, J. H. Eaton, was head of the legal department, the vice-president and assistant general manager of the land company and its highest salaried employee. The land company had 500,000 shares of stock outstanding of which the holding company held 499,995 shares during the taxable year. The five remaining shares were owned one share each by separate individuals. *115 During each of the taxable years the same five persons constituted the board of directors of the holding company and the land company. Hubert Eaton was president and R. R. Munger, his brother-in-law, was treasurer of both concerns. The holding company was an investment corporation and like the land company made no claim of exemption from taxes. It had 800,000 shares of capital stock outstanding during the taxable years held as follows: AMERICAN SECURITY & FIDELITY CORPORATION CAPITAL STOCK OUTSTANDING Dec. 31,
Dec. 31,
Dec. 31,
Dec. 31,
1938
1939
1940
1941
Hubert Eaton
113,915
116,515
142,897
116,723
Mrs. Anna Munger Eaton
159,080
159,080
142,080
129,802
B. O. Miller
1,000
J. H. Eaton
4
4
4
4
Roy R. Munger
500
500
500
500
Mrs. M. E. Llewellyn - 16,312 s
Fredk. Llewellyn - 1941 500s]
16,312
16,312
16,312
16,812
Hubert Eaton, Trustee
60,000
60,000
60,000
60,000
Hubert Eaton, Trustee
60,000
60,000
60,000
60,000
409,811
412,411
421,793
384,841
Bank of America, Pledgee for W. I. Hollingsworth
95,000
Estate of W. I. Hollingsworth
200,000
100,000
W. I. Hollingsworth, Jr.
3,175
3,175
Mrs. Flora H. Mullin
4,000
4,000
Mrs. Ruth Piper Hollingsworth
207,175
202,175
None
None
Forest Lawn Company
14,000
14,000
218,555
263,182
Other stockholders
169,014
171,414
159,652
151,977
183,014
185,414
378,207
415,159
Total
800,000
800,000
800,000
800,000
*116 Stockholders of the holding company related to Hubert Eaton by blood or marriage in addition to those heretofore are Anna Munger Eaton, his wife, Mrs. M. E. Llewellyn, his sister, and Frederick Llewellyn, his nephew. The holding company had no salaried employees. During the taxable years, as in prior years, petitioner paid certain rentals to the land company and the holding companies for buildings and improvements erected in Forest Lawn Memorial Park and leased to it by such companies. Petitioner had no funds with which to erect such buildings and contracted for their construction with the other companies upon a reasonable rental basis. The boards of directors endeavored to make a lease that was fair to both parties, the rentals determined being based upon a percentage of petitioner's gross business. During the taxable years petitioner paid the holding company and the land company the following rentals for lands, buildings, structures and equipment having a total cost to the holding and land companies as follows: Total Cost
Year
Rental
of Properties
1938
$102,817.73
$ 707,141.62
1939
104,069.29
981,403.83
1940
125,416.65
1,014,999.97
1941
152,041.53
1,070,076.32
Averages
$121,086.30
$ 943,405.44
Average return 12.83%
*117 Under the lease provisions petitioner took care of the repairs, carried the insurance on the leased premises, and agreed to care for and maintain, in a reasonable condition, the undeveloped and semi-developed areas of Forest Lawn Memorial Park. A description of the lands and buildings leased to petitioner by the land company is set forth in Exhibit M as follows: Site for Administration Buildings, including Administration Building, Mortuary Buildings and addition, Telephone Building and garages located thereon; Entrance areas, including the Duck Pool and planting area adjacent thereto, and directory board site; Employees' Auditorium Building and addition thereto; Architects and Engineers Building; Maintenance and Employees' Recreation and Locker Room Building, Tool and Supply House, Shops, Storage Sheds, Garages, Wells Nos. 3 and 4, Pumping Plant and Reservoir, Conduit System, Receiving Vaults, Fire Protection System, Nursery, Lath and Green Houses, Roads and Land in Nursery, Garage and Tool Yard areas; Mount Forest Lawn Section including the Tower of Legends; Little Church of the Flowers Section and Parts 1 and 3 of Lot 2 and all of Lot 4 of Tract 3210; together with all land on which *118 any of said buildings are situated and that adjacent thereto and necessary for ingress and egress or other use in connection therewith. The land costs and the costs of developing lands acquired by the land company for cemetery purposes, accumulated to and during the taxable years, were as follows: Land Develop-
Dec. 31
Land Cost
ment Costs
Total
1938
$469,161.53
$1,765,011.53
$2,234,173.06
1939
566,433.99
1,869,356.81
2,435,790.80
1940
566,433.99
1,909,584.59
2,476,018.58
1941
571,859.20
2,038,230.69
2,610,089.89 Land dedicated to cemetery purposes is usually turned over to the non-profit cemetery company as raw land without or with only minor improvements thereon. The leases between petitioner and the land and holding companies averaged an annual return of 12.83 percent on their investment during the taxable years as against an annual average return of 10.19 percent on the annual average investment for the years 1933 to 1937, inclusive. During the taxable years the land company sold land, crypts, and statuary to petitioner for which it received about 30 percent of petitioner's gross sales as compared with about 35 percent for the years 1933 to 1937, inclusive. Petitioner's income tax returns for the *119 taxable years reported total income, deductions, net income and taxes as follows: 1938
1939
1940
1941
Total Income
$955,099.55
$1,034,958.57
$1,113,914.57
$1,266,303.37
Deductions
933,578.57
946,789.34
1,010,174.18
1,111,219.17
Net Income
$ 21,520.98
$ 88,169.23
$ 103,740.39
$ 155,091.20 *
Tax Reported
$ 2,968.36
$ 16,752.15
$ 24,897.70
At the end of 1937 petitioner had an earned surplus of $64,566.71 which increased to $387,515.77 at the end of 1941. This surplus was increased by a revenue agent to $628,258.22 as of December 31, 1941 by adding reserves for Federal income taxes for 1938, 1939 and 1940, unrealized profits on installment sales, and surplus appropriated from profit and loss for 1941. For the taxable years 1938 petitioner paid income taxes aggregating $2,968.36 as follows: March 15, 1939
$742.09
June 14, 1939
742.09
September 13, 1939
742.09
December 12, 1939
742.09 On March 14, 1942 petitioner filed a claim for refund of the $2,968.36 income taxes paid for 1938 based upon the following ground: The United States Board of Tax Appeals, in its decision promulgated December 26, 1941 (Docket No. 102989, 45 B.T.A. No. 168) held that Forest Lawn *120 Memorial Park Association, Inc. was exempt from Federal income taxes under the provisions of Section 101(5) of the Revenue Act of 1936. Section 101(5) of the Revenue Act of 1938 is identical with Section 101(5) of the Revenue Act of 1936. Further the Association has not changed its form of organization or methods of operation and consequently is exempt under the provisions of the 1938 Revenue Act. For the taxable year 1939 petitioner paid income taxes aggregating $16,752.15 as follows: March 12, 1940
$4,188.06
June 13, 1940
4,188.03
Sept. 12, 1940
4,188.03
Dec. 11, 1940
4,188.03 On March 14, 1942 petitioner filed a claim for refund of the $16,752.15 income taxes paid for 1939 upon the ground that it was exempt as set forth in its claim for refund of 1938 taxes. For the taxable year 1940 petitioner paid normal, surtax and declared value excess profits taxes aggregating $24,897.90 as follows: March 15, 1941
$6,224.42
June 12, 1941
6,224.42
Sept. 12, 1941
6,224.43
Dec. 12, 1941
6,224.43 On March 14, 1942 petitioner filed a claim for refund of the $24,897.90 paid for 1940 taxes upon the ground that it was exempt as set forth in its claim for refund of 1938 taxes. Also for the taxable year 1940 petitioner *121 paid excess profits taxes aggregating $3,181.85 as follows: March 15, 1941
$1,602.86
Sept. 12, 1941
795.47
Dec. 12, 1941
795.46 An extension for filing the excess profits tax return having been granted to June 15, 1941, petitioner paid interest of $11.94 on June 14, 1941. On March 14, 1942 petitioner filed a claim for refund of the $3,181.85 excess profits taxes for 1940 upon the ground that it was exempt as set forth in its claim for refund of 1938 taxes. The above taxes and interest were paid within three years of filing of the claim for refund. The petition herein was filed on June 7, 1943. Petitioner is a cemetery company not operated for profit during the taxable years. It was chartered solely for burial purposes as a cemetery corporation and was not permitted by its charter nor did it during the taxable years engage in any business not necessarily incident to the purpose for which it was organized. No part of the net earnings of the petitioner inured to the benefit of any private shareholder or individual. Opinion The principal issue is whether petitioner is exempt from taxation under the identical provisions of section 101 (5) of the Revenue Act of 1938 and section 101 (5) of the Internal Revenue Code. *122 The statutory provisions are set forth in the margin. [1] Petitioner contends not only that it is an exempt corporation under the statute, but also that the former decision of the Board of Tax Appeals in 45 B.T.A. 1901, which involves the years 1933 to 1937, inclusive, is res judicata of the issue. We examine petitioner's last contention first for the reason that if the plea of res judicata is well founded, there is no necessity for considering this case on its merits as respondent would be estopped by the prior judgment. We think that the question of whether petitioner is exempt from taxation in this proceeding depends upon the facts as they *123 existed in the taxable year. It cannot be said that the present facts are the identical facts that existed in the prior years. Some of the facts existing during the period 1933 to 1937, inclusive, continued to exist during the taxable years, but other facts are merely similar. In this situation we prefer to rest our determination upon a consideration of the merits of the controversy. See United Business Corporation of America, 33 B.T.A. 83; Linen Thread Co. Ltd., 4 T.C. 802, affirmed 152 Fed. (2d) 625; Engineer's Club of Philadelphia v. United States, 42 Fed. Supp. 182, certiorari denied, 316 U.S. 700; Monteith Bros. Co. v. United States, 142 Fed. (2d) 139. In presenting his case upon the merits respondent is confronted at the outset with the difficult task of successfully distinguishing this case from our prior decision. His contentions in the two cases are from necessity much the same. His emphasis here has been placed upon the numerous incidental activities and the profitable operations of the petitioner. It is urged that petitioner was operated to a large extent for the benefit of the land and holding companies and for the benefit of individuals connected with petitioner. *124 It is pointed out that Eaton and members of his family benefited from petitioner's operations and from the operations of the taxable companies. Our attention is directed to the surpluses accumulated by petitioner and the other companies, to the dividends paid by the taxable companies, to the stockholdings of Eaton and his various relatives, and the benefit they derived directly and indirectly from the profitable operations of the petitioner. It is true that petitioner operated Forest Lawn at a profit, but it cannot be said that it was a cemetery company organized or operated for profit. On the contrary it was organized as a non-profit cemetery company and it has made no distribution of profits to its members. Its predominant purpose, as we said in our prior opinion was "to operate and maintain a cemetery for the interment of the dead." 45 B.T.A. 1091, 1100. No additional fact is presented or change in charter or by-law urged to show that petitioner has changed its predominant purpose during the taxable years. We can find no new or different activities on the part of petitioner which might indicate a change in its predominant purpose. It is our opinion therefore that petitioner continued *125 during the taxable years to be a non-profit cemetery company and that any profit resulting from its sales and services was incidental to its primary function of operating and maintaining a cemetery for the interment of the dead. Respondent's contention that the profits resulting from petitioner's operation inured to the benefit of the taxable companies and through them to Eaton and his relatives is far from persuasive. It is not argued that the contracts between petitioner and the land and holding companies were not arm's length transactions or that the rentals and commissions fixed therein were unreasonable. As a matter of fact the companies were very circumspect in their dealings with each other. Petitioner benefited therefrom and respondent has not challenged the consideration for the several contracts. His contention that by these various arrangements the taxable companies derived profits which inured to the benefit of their stockholders, some of whom belonged to the Eaton family group by birth or marriage, would seem to be immaterial to the issue. In the first place the sums paid to the taxable companies were no part of petitioner's net earnings; the payments were rentals, or *126 a percentage of the gross proceeds from the sale of lots, niches, crypts, vaults, etc. Such payments would have to be deducted by petitioner from its gross sales before its net earnings could be computed. The statute, it should be noted, speaks of a cemetery corporation "no part of the net earnings of which inures to the benefit of any private shareholder or individual." It does not deal with the net earnings of a land company or a holding company, admittedly taxable, no matter how closely connected they may be with the cemetery corporation. By a parity of reasoning the percentage of gross sales paid to Eaton as compensation for his services must be eliminated from petitioner's gross sales before its "net earnings" could be determined. The amount of compensation received by Eaton during the taxable years for his services was reasonable and is not questioned by respondent. It represented the cumulative results of years of building Forest Lawn to the preeminent position it occupied in the cemetery industry. The testimony shows that other cemeteries were paying their general managers a larger percentage of gross sales than the percentage received by Eaton. The volume of sales accounted *127 for the size of Eaton's compensation; and the volume of sales in turn depended in a large measure upon the personal achievements, ability and efficiency of Eaton in conceiving and carrying out the development of Forest Lawn. The surplus accumulated by petitioner during the taxable years is one of the pillars relied upon by respondent to show that petitioner is now a profit minded corporation. It is contended that the large surplus computed by respondent as exisiting at the end of the taxable year 1941 is unnecessary for a non-profit cemetery company, that such sum may be used for some purposes other than exclusively for the benefit of the members, which would defeat the exemption claim. It is also pointed out that the taxable companies had accumulated very substantial surpluses and had declared and paid substantial dividends, which were derived in part through petitioner's operations. This contention is fully answered as to petition in our prior opinion at page 1099 thereof as follows: * * * Petitioner was organized in 1926 as a non-profit cemetery corporation under the laws of California. The law permitting the organization of such corporations (sec. 593, Civil Code of California) *128 prohibited the distribution of gains, profits, or dividends to the members thereof. Petitioner's articles of incorporation specifically provide that it shall be operated without profit to any of its members, and its bylaws state that its profits must be expended in the improvement of the cemetery property or for the benefit of the association and cannot be disbursed to any individual or corporation. The general manager of petitioner and one of its members both testified it was understood, when petitioner was organized, that its members would receive no dividends or distributions of any kind, and that even upon petitioner's liquidation, its assets would not go to its members but would constitute a trust fund for the benefit of all the lot owners, to be used for the perpetual care and upkeep of the cemetery. The bylaws referred to above and the further provision that termination of membership should not entitle the member to participate in the assets of the corporation indicate that this understanding must, and will, be carried out. In so far as the surpluses of the land and holding companies are concerned the answer to respondent's argument is that these companies reported their income *129 and paid the tax thereon. The fact that their business activities were in large measure connected with petitioner neither defeats the latter's claim for exemption nor lays the groundwork for an assumption that the profits of the latter inured to the benefit of a private shareholder or individual. We must recognize here the separate identities of the corporations and that their several agreements grew out of arm's length transactions between them. The fact that Eaton and members of his family group were large stockholders in the holding company does not, standing alone, or in combination with the other facts of record, defeat petitioner's claim of exemption. Whether the net earnings of the holding company inured to the benefit of a shareholder or private individual is beside the point. Neither the holding company nor the land company is before us. In Commissioner v. Kensico Cemetery, 96 Fed. (2d) 594, affirming 35 B.T.A. 498, the Court said: There are three statutory requisites for exemption and these are mutually independent. The presence of any of them creates an exemption. Here petitioner was chartered solely for burial purposes as a cemetery corporation and not permitted by its *130 charter to engage in any business not necessarily incident to that purpose, and no part of its net earnings inured to the benefit of any private shareholder or individual. We hold that petitioner is exempt from taxation for the taxable years, that it has overpaid its taxes for the years 1938, 1939, and 1940, that such overpayments and interest were paid within three years of filing its claim for refund, and that there are no deficiencies in income or excess profits taxes for the taxable year 1941. Forest Lawn Memorial Park Association, Inc., supra.
Decision will be entered for the petitioner. Footnotes
*. Excess of income over deduction; exemption claimed for 1941.↩
1. SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS. The following organizations shall be exempt from taxation under this title - * * * * *
(5) Cemetery companies owned and operated exclusively for the benefit of their members or which are not operated for profit; and any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual; * * * * *↩